UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

RANDALL ALAN WILLIAMS                                                        PLAINTIFF

VERSUS                                              CIVIL ACTION NO. 1:15CV137-RHW

KRISTI BOURN et al                                                          DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Plaintiff Randall Alan Williams, proceeding *pro se* and *in forma pauperis*, filed a 42

U.S.C. § 1983 prisoner civil rights complaint alleging that various defendants violated his

constitutional rights by subjecting him to excessive force incident to an arrest and by failing to

provide adequate medical care subsequent to the arrest.  Doc. [1].  The Court conducted a

screening hearing on October 15, 2015.  *See* Minute Entry (10/15/2015); Doc. [145-1].  There

are now several pending motions for summary judgment filed by the various Defendants.  Doc.

[139] [145] [146] [148].

## Factual Background

### (1) The Arrest

### Plaintiff's Account

In his complaint, Plaintiff alleged that on January 26, 2015, while being pursued by City

of Pascagoula police officers, he "ran a few yards on foot then laid down on the ground face first

and spread out his arms screaming out 'I surrender. I give up.'"  Doc. [1] at 6.  Officer John Doe

#1 (later identified as Defendant Sergeant Scott Clayton) flipped the Plaintiff over and started

punching him "repeatedly" in the face while a K-9 Officer (Rambo) bit him two or three times.

*Id.* Officer Clayton then flipped Plaintiff back over and began searching him. Officer Clayton poked himself with a syringe in Plaintiff's pocket and started screaming obscenities. *Id.* Officer John Doe #2 (later identified as Defendant Sergeant Richard Davis) released Rambo resulting in 14 more bites. *Id.* Plaintiff alleges that he never resisted arrest. *Id.* In an amended complaint, Plaintiff added as Defendants Pascagoula police officers Joshua Ghabbour, Lionel Bourgeois, Michael Dunn, and Steven Loris, whom he alleged were present during the arrest and had an opportunity to intervene and protect Plaintiff from excessive force committed by Davis and Clayton. Doc. [40] & [69].

At the screening hearing, Plaintiff elaborated on the factual allegations. He testified that on the night of the incident he was a passenger in a vehicle driven by Christopher Allen Joiner being pursued by police officers. Doc. [145-1] at 14. After about a 30-minute car chase, Plaintiff and Joiner exited the car and ran a "short distance" into the back yard of a residence. *Id.* at 15-16. Plaintiff testified that Joiner was a few feet ahead of him. *Id.* at 16. Joiner hit the ground and Rambo was on him. *Id.* Plaintiff stated that he saw officers everywhere, so he laid down on the ground and spread his arms out. *Id.* About 30 seconds later, Officer Clayton rolled Plaintiff over on his back and started punching him in the face. *Id.* Officer Clayton rolled him back over on his stomach. At that time, Plaintiff felt the dog bite him once or twice. *Id.* Officer Davis and Officer Ghabbour then handcuffed Plaintiff. *Id.* at 16-17. According to Plaintiff, Officer Ghabbour got pricked by a needle in Plaintiff's pocket. *Id.* at 17. Officer Ghabbour started screaming and backing up off of Plaintiff. *Id.* at 17. When Officer Ghabbour started yelling, Officer Davis released Rambo who started biting Plaintiff again. *Id.* Plaintiff testified that Officer Davis kept releasing Rambo to bite Plaintiff. *Id.* at 18. At one point, Officer Davis pulled off Plaintiff's shoe. *Id.* Rambo jumped forward and started biting Plaintiff's foot and

toes.  *Id.*  After the officer got the dog off of him, Plaintiff was taken to the police cruiser for transportation to the Pascagoula Police Station.  *Id.* at 18-20.

### Arresting Officers' Account

The arresting officers submitted affidavits and police reports that provide a slightly different account of the arrest.  *See* Doc. [148-1] [148-3] [148-4] [148-7] [148-8] [148-9] [148-10] [148-11].  On the evening of January 26, 2015, at approximately 9:00 p.m., officers pursued a vehicle driven by Joiner following the commission of an armed home invasion.  Plaintiff and Joiner were later charged with armed robbery relating to the events from January 26, 2017.  Doc. [145-1] at 14.  In fact, Plaintiff later pleaded guilty to charges stemming from the incident.  Doc. [146-2] at 1-2.  During the pursuit, Joiner stopped the car and the two fled on foot into a residential neighborhood.  Officer Davis exited his vehicle and released Rambo, while Officer Davis pursued on foot.  Officers Ghabbour and Clayton also pursued on foot.  Eventually, Rambo caught up to Plaintiff, bit him, and held onto his lower leg.  Officer Davis instructed Plaintiff to get on the ground multiple times.  Plaintiff did not comply.  Instead, Plaintiff's hands moved towards his waist.  Officer Davis then approached Plaintiff and struck him with a closed fist to his nose and forced him to the ground.  When Officer Ghabbour arrived to assist with the apprehension of Plaintiff, he saw Plaintiff in a seated position facing him, unsecured with his hands free.  Ghaboour ran into Plaintiff, knocking his upper body to the ground.  Ghabbour and Davis were then able to get Plaintiff's hands behind his back and handcuffed.  Officer Davis did not immediately command Rambo to release out of concern for the safety of himself and the other officers.  Once Plaintiff was secured and handcuffed, Officer Davis commanded Rambo to release.  Once Rambo let go of Plaintiff, Officer Davis pulled Rambo back and did not release him again.  Following a search of Plaintiff, a handgun was recovered, as well as marijuana and a

syringe. Officer Bourgeois' police report confirmed that Ghabbour's hand may have been punctured by the syringe in Plaintiff's pocket.

According to the officers' affidavits, Sergeant Clayton never entered the backyard where Plaintiff was apprehended, was not part of Plaintiff's apprehension, and had no physical contact with Plaintiff. Likewise, Officers Dunn and Loris were involved in the pursuit of the fleeing felons, but stated that they had no involvement in Plaintiff's apprehension, which occurred in the back yard. Rather, they were busy securing Joiner in the front yard, about 15 to 25 feet away, separated from Plaintiff by a four-foot high chain link fence. Officer Bourgeois did not arrive at the scene until after Plaintiff and Joiner had been secured and handcuffed.

### Video Evidence

Plaintiff filed a motion to compel production to the Court of video and audio recordings that he alleged demonstrate the use of excessive force during his arrest. Doc. [151]. Out of an abundance of caution, the Court compelled production of the recordings. Doc. [164]. The Court received and reviewed the recordings and finds them to be inconclusive. They depict a chase, but a fence obstructs the view of the camera. Rambo can be heard barking and Plaintiff can be heard yelling, but the audio and video do not provide material summary judgment evidence on any disputed issue of fact.

### (2) Medical Treatment

### Plaintiff's Account

In his complaint, Plaintiff alleged that he was denied medical care from January 26, 2015, to February 15, 2015, for injuries sustained during the arrest. Doc. [1] at 7. Corporal Lamar Palmer was the intake officer at Jackson County Adult Detention Center (JCADC) on the night of January 26th. *Id.* He informed Plaintiff that only a nurse employed by Health Services, LLC

could send Plaintiff to the hospital. *Id.* Plaintiff alleged it was obvious that he needed stitches and treatment. *Id.* He further alleged Nurses Kristi Bourn, Jessica Bolen and Jane Doe #1 (later identified as Samantha Jones) failed to treat him and that the policy of Health Assurance LLC is to give treatment only for life threatening injuries. *Id.*

At the screening hearing, Plaintiff testified that once he arrived at the Pascagoula Police Station following his arrest he started asking every officer to please get him an ambulance and to please get him some help. Doc. [145-1] at 20. He was informed that an ambulance was being called. *Id.* According to Plaintiff, an EMT arrived on two separate occasions and told Plaintiff to sign an "electronic box". *Id.* at 20-22. Plaintiff signed the box each time. *Id.* He stated that his face was swollen shut; he could not see and was very dizzy; so he was having problems reading what the box said. *Id.* at 21. Plaintiff testified that on the second occasion, when he did not sign the box right away, an officer in the booking area bowed up at Plaintiff and said "Oh, he ain't gonna sign the box". *Id.* at 22. According to Plaintiff, he "realized real quick what was going on" so he signed the box and sat back down. *Id.* Officer Mike Dunn then took Plaintiff's booking pictures. Plaintiff was later transported to JCADC. *Id.* at 22-23. Prior to the transport, he had stayed at the Pascagoula Police Station for about an hour or hour and a half. *Id.*

Once he arrived at the JCADC, Plaintiff told Corporal Palmer he needed to see a doctor. *Id.* at 23. Corporal Palmer explained that only nurses can authorize medical attention and the nurses would not be at JCADC until the next day. *Id.* at 23-24. The next morning, Plaintiff was seen by Nurse Kristi Bourn. *Id.* at 24. She gave him a bucket of water with Betadine in it and gave Plaintiff gauze and ibuprofen. *Id.* According to Plaintiff, he had 14 dog bites, a toe completely bitten in half, and a fractured nose. *Id.* Over the next three weeks, Plaintiff testified that he was examined by medical staff, had his foot cleaned, and was given ibuprofen. *Id.* at 25-

27.  Plaintiff complained that the medical staff used abusive language towards him.  *Id.*
According to Plaintiff, he later received x-rays that showed his toe broken in three places.  *Id.*

**Medical Providers' Account**

Defendants submitted affidavits from Nurses Samantha Jones, Kristi Bourn, and Jessica Bolen.  Doc. [145-6] [145-7] [145-8].  Jones, Bourn, and Bolen were nurses employed by Health Assurance, LLC working in the Medical Department at JCADC at the time of the allegations in Plaintiff's complaint.  According to their affidavits, Plaintiff arrived at JCADC on January 27, 2015, at 2:03 a.m. with blood around his nose and on his right foot.  Later that day, at approximately 11:20 a.m., personnel in the Medical Department assessed Plaintiff's condition.  Dr. Grayson ordered a foot soak with Betadine every day for three days, ibuprofen 400 mg twice a day for three days, and Triple Antibiotic Ointment for the right toe every day for three days, with a reassessment of Plaintiff after three days.  On February 3, 2015, Plaintiff received a health and mental status examination.  His right foot was soaked in warm water with Betadine and he was encouraged to leave the injury open to the air to heal better.  Jones, Bourn, and Bolen all stated that Plaintiff's injuries did not require stitches and did not require that he be sent to the hospital for other treatment.  Plaintiff's medical records corroborate the statements in the affidavits of Jones, Bourn, and Bolen regarding his course of treatment.  Doc. [139-2] at 2-8; [145-2] at 8-9, 15.  A physical examination of Plaintiff's nose showed "mucosa, septum, and turbinates normal", without mention of any fracture.  Doc. [148-6] at 3.  X-rays taken on February 19, 2015, foot showed a "normal right foot" "free of trauma or other abnormality".  Doc. [145-4] at 18.  Another x-ray taken June 16, 2015 also revealed a normal right foot with "no fractures, dislocations, or soft tissue swelling."  Doc. [145-3] at 25.

<u>**Law and Analysis**</u>

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010). Where the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, all other contested issues of fact are rendered immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Topalin v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1992). In making its determinations of fact on a motion for summary judgment, the court must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984).

The moving party has the duty to demonstrate the lack of a genuine issue of a material fact and the appropriateness of judgment as a matter of law to prevail on its motion. *Union Planters Nat'l Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982). The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues. *Topalian*, 954 F.2d at 1131. "Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]." *John v. State of Louisiana*, 757 F.3d 698, 708 (5th Cir. 1985). Once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v. Nat'l Broad. Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978).

**(1) City of Pascagoula**

With respect to Defendant City of Pascagoula, Plaintiff alleges that Pascagoula has a policy of allowing excessive force against fleeing felons. At the screening hearing, Plaintiff confirmed that this is the basis of his lawsuit against Pascagoula. When asked what proof he has regarding the alleged policy or custom, Plaintiff admitted that he had no proof but indicated that he planned to explore the issue in discovery.

To properly assert municipal liability under § 1983, a plaintiff must establish that the municipality was a policy maker, that it had an official policy or custom, and that this policy or custom was the "moving force" behind the violation of constitutional rights. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). A city is not liable for constitutional violations committed by its employees unless those violations result directly from a municipal custom or policy. *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010). It is only when the execution of a government's policy or custom inflicts the injury that the government may be found liable. *Monell*, 436 U.S. at 679-80. Municipal liability may not be predicated on a theory of *respondeat superior. Sanders-Burns*, 594 F.3d at 380. Moreover, isolated violations do not constitute custom and policy. *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984).

Plaintiff has failed to identify a municipal policy or custom that was the moving force behind the alleged constitutional violation. Rather, Plaintiff argues that individual Pascagoula police officers failed to follow Pascagoula's policies and procedures. To establish municipal liability under § 1983, "[t]he failure to follow procedural guidelines, standing alone, does not implicate constitutional liability." *Evans v. City of Marlin, Texas*, 986 F.2d 104 n.6 (5th Cir. 1993). In response to the motion for summary judgment, Plaintiff argues that the actions of

Pascagoula's police officers are strictly prohibited by the City of Pascagoula's policies and procedures. Doc. [152] at 6-8. In other words, he is not implicating an unconstitutional policy or custom. He merely argues that the individual officers failed to follow the applicable policy. Plaintiff's allegations are insufficient to establish a constitutional claim against Defendant City of Pascagoula. Accordingly, the Court finds that the City of Pascagoula's motion for summary judgment should be granted. By the same token, any official capacity claims against Defendants who were employees of the Pascagoula Police Department are dismissed because a claim brought against a government employee in his official capacity is actually a claim against the governmental entity itself. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).

### (1) Medical Care

Plaintiff alleges that he received inadequate medical care for treatment of injuries sustained during his arrest. He alleges that when he arrived at JCADC, Defendant Palmer refused to send him to the hospital, even though it was obvious that he needed stitches and treatment. According to Plaintiff, Palmer relied on a policy that only a nurse employed by Health Service, LLC would be authorized to send him to the hospital. He also alleges that JCADC does not keep nurses on duty from 10:00 p.m. to 6:00 a.m. He further alleges that Nurses Jones, Bourn, and Bolen failed to give adequate treatment for his injuries because they should have sent him to the hospital for stitches, x-rays, and pain medication.

Plaintiff was a pre-trial detainee at the time of the alleged inadequate medical care. The Fifth Circuit has recognized that there is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care. *See Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001) (citing *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir.

1996) (en banc)).  In other words, the same legal standard governs constitutional claims concerning medical care by pretrial detainees and convicted inmates.  *See id.*

To state a constitutional claim for denial of adequate medical care, a plaintiff must demonstrate that defendants were deliberately indifferent to plaintiff's serious medical needs, such that it constituted an unnecessary and wanton infliction of pain.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A prison official is not liable for the denial of medical treatment unless the official knows of and disregards an excessive risk to inmate health or safety.  *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).  The Constitution guarantee prisoners "only adequate, not optimal medical care."  *Spriggins v. LaRavia*, 2012 WL 1135845, at *4 (E.D. La. Apr. 4, 2012) (emphasis in original), citing *Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006).  An allegation of malpractice or mere negligence is insufficient to state a claim.  *Hall v. Thomas*, 190 F.3d 693, 697 (5th Cir. 1999).  Moreover, the fact that a prisoner disagrees with the type of medical treatment does not constitute a constitutional deprivation.  *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997).

Plaintiff has failed to allege deliberate indifference.  To the contrary, summary judgment evidence demonstrates Defendants were not deliberately indifferent to his serious medical needs.  Plaintiff merely disagrees with the course of medical treatment.  Plaintiff was arrested by City of Pascagoula police officers at approximately 9:30 p.m. on January 26, 2015.  Doc. [139-1] at 8; Doc. [148-3] at 1.  Acadian Ambulance Services twice arrived at the Pascagoula Police Station to treat Plaintiff on the night of the arrest.  Plaintiff admits that the EMTs inspected his wounds and took his vital signs.  Doc. [142] at 2-3.  They first arrived at 9:52 p.m.  Doc. [146-8] at 2.  EMT DeAnna Reynolds reported canine bit, minor abrasions, superficial small puncture on right foot, and blood in nose.  *Id.* at 3.  Plaintiff apparently refused further treatment.  *Id.*  Acadian

Ambulance Services arrived a second time at 10:23 p.m. Doc. [146-8] at 5. EMT Adam Pitalo reported Plaintiff's chief complaint as chest pain. *Id.* An EKG was performed. *Id.* at 6. Again, Plaintiff apparently refused further treatment. *Id.* at 7. While Plaintiff suggests that he signed the "electronic box" refusing treatment out of confusion or under duress, the undisputed fact remains that an ambulance was called on two occasions and that EMTs examined his injuries and vital signs.

Plaintiff arrived at JCADC at 2:03 a.m. on January 27, 2015. Deputy Michael Nutefall and Deputy Lamar Palmer of the Jackson County Sheriff's Department spoke with the transporting officer and spoke with Plaintiff on his arrival at JCADC. Doc. [139-4] & [139-5]. Based on their observations and conversations with the Pascagoula Police Department, they determined that Plaintiff did not require emergency medical treatment. *Id.* Nutefall and Palmer were aware that Acadian Ambulance Services had examined Plaintiff prior to his transfer to JCADC. *Id.* Later that morning, at approximately 11:20 a.m., personnel at the JCADC Medical Department examined Plaintiff's injuries and ordered a foot soak with Betadine every day for three days, ibuprofen 400 mg twice a day for three days, and Triple Antibiotic Ointment for the right toe every day for three days, with a reassessment of Plaintiff after three days. Doc. [145-6] [145-7] [145-8]. On February 3, 2015, Nurse Bourn conducted Plaintiff's health and mental status exam. Doc. [145-7] at 2. Plaintiff's foot was soaked in warm water with Betadine and he was encouraged to leave the injury open to the air so the injury would heal better. *Id.* The dog bites were scabbed and healing. *Id.* On February 15, 2015, Plaintiff left JCADC for Central Mississippi Correctional Facility. Plaintiff's foot was x-rayed twice, which revealed no fractures or abnormalities. Doc. [148-6] at 1-2. Defendants have presented summary judgment evidence demonstrating the absence of a genuine issue of material fact regarding Plaintiff's allegations of

deliberate indifference to his medical needs. The medical records and Plaintiff's own testimony demonstrate that in fact he received medical care. At most, Plaintiff has stated his disagreement with the type or method of treatment because he believes he should have been taken to the emergency room for stitches, x-rays, and pain medication. The nurses indicated that Plaintiff did not need stitches nor did he require treatment at a hospital; the medical records (including x-rays of his right foot) make no mention of fractures to his nose or toes; and he was prescribed ibuprofen for pain while at JCADC.

The Court also finds that the claims against Jackson County should be dismissed. Plaintiff alleges that Jackson County has a policy of having no medical staff at the JCADC from 10:00 p.m. to 6:00 a.m. As a consequence, he asserts that he could not get medical care when he first arrived at JCADC. The summary judgment evidence demonstrates that Plaintiff was twice seen by EMTs immediately after his arrest. Plaintiff arrived at JCADC shortly after 2:00 am. He was visually assessed by Deputies Palmer and Nutefall, who also contacted the Pascagoula Police Department about Plaintiff's injury. They determined that he did not require emergency medical treatment. Later that same day, medical staff examined and treated Plaintiff's injuries. Plaintiff has failed to identify a constitutional violation with respect to his medical care. Nor has he identified a policy that was the moving force behind any alleged constitutional violation. Plaintiff's contention is that he should have received immediate and instantaneous medical care at JCADC. Given the nature of his injuries and the fact that Plaintiff received medical care immediately after his arrest and then again several hours after arriving at JCADC, he has failed state a constitutional claim against Jackson County for inadequate medical care based on any policy or custom.

Defendant Palmer is entitled to qualified immunity because his actions were objectively reasonable under the circumstances. It is undisputed that Palmer visually assessed Plaintiff's injuries and discussed Plaintiff's injuries with Pascagoula police officers after Plaintiff was transferred to JCADC. In is also undisputed that Palmer was aware Acadian Ambulance Services examined Plaintiff on two occasions prior to his transfer to JCADC. Plaintiff's follow-up care by medical professionals indicated that he did not require a trip to the hospital, did not require stitches, and did not have a broken toe. Palmer's decision not to order Plaintiff transported to the hospital for immediate care was not unreasonable under the circumstances.

The Court also finds that Plaintiff has failed to state a claim against the medical providers, or any of the Defendants, for use of derogatory or abusive language. *See Robertson v. City of Plano, Texas*, 70 F.3d 21, 24- (5th Cir. 1995); *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983).

### (2) Excessive Force

Plaintiff alleges that Defendant Davis and/or Defendant Clayton used excessive force during his arrest. Although Plaintiff originally identified Officer Clayton as the individual who punched him, Officer Davis admitted in an affidavit that he punched Plaintiff. Doc. [148-3]. Officer Ghabbour also admitted to knocking Plaintiff to the ground. Doc. [148-4]. In his affidavit, Defendant Clayton stated that he was not part of Plaintiff's physical apprehension, did not have physical contact with Plaintiff, and did not enter the backyard where Plaintiff was apprehended. Doc. [148-7]. The Defendants assert a defense of qualified immunity.

The qualified immunity analysis is a two-step inquiry. *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001). First, the Court must determine whether the Plaintiff has alleged a violation of a constitutional right. *Id.* Second, if the plaintiff has alleged a constitutional

violation, the Court must decide whether the conduct was objectively reasonable in light of clearly established law.  *Id.*  If the officer's actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to underlying intent or motivation, then he is entitled to qualified immunity.  *Ramirez v. Knoulton*, 542 F.3d 124, 128-29 (5th Cir. 2008).  An officer is protected by qualified immunity even when he reasonably, but mistakenly, believed the circumstances justified using more force than in fact was needed.  *Saucier v. Katz*, 121 S.Ct. 2151, 2158 (2001).

In order to state a claim for excessive force, the plaintiff must establish (1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.  *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007).  When determining whether a defendant used excessive force, the core inquiry is whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  *Baldwin v. Stalder*, 137 F.3d 836, 838 (5th Cir. 1998).  Some of the relevant objective factors in the inquiry regarding the application of force include (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the defendant; and (5) any efforts made to temper the severity of the forceful response.  *Id.* at 838-39.

It is undisputed that Plaintiff suffered some injuries resulting from arrest.  There is some question as to the severity of those injuries, as the medical records do not support all of Plaintiff's allegations.  What remains at issue is whether the force used by Defendant Davis and/or Clayton was clearly excessive and unreasonable.  Looking solely at Defendant Davis' affidavit and the affidavits of other officers involved in the arrest, both Davis and Clayton would be entitled to qualified immunity.  Plaintiff was an armed, fleeing felon.  Officers pursued

Plaintiff and his co-felon on foot, at night, in a residential neighborhood. During the pursuit, Rambo caught up to Plaintiff, bit him, and held onto Plaintiff's lower leg. As Davis moved towards Plaintiff, Plaintiff turned to face Davis. Davis instructed Plaintiff to get on the ground, but Plaintiff did not comply. Plaintiff's hands moved towards his waist, at which point, Davis struck Plaintiff in the face with a closed fist and forced him to the ground. Rambo assisted in subduing Plaintiff until Plaintiff was secured and handcuffed. The force used by Davis was applied in a good faith effort to subdue an armed, fleeing felon who posed a danger to Davis' safety and the safety of other officers. Under this set of facts, Davis would be entitled to qualified immunity. *See Johnson v. Scott*, 576 F.3d 658, 659-60 (7th Cir. 2009); *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009). Likewise, Defendant Clayton would be entitled to qualified immunity because he was not present at Plaintiff's apprehension and had no physical contact with Plaintiff.

Plaintiff's allegations and testimony tell a different story. He alleged that he was lying face down with his arms spread out screaming "I surrender". After lying on the ground for about 30 seconds, Defendant Clayton rolled Plaintiff over and punched him repeatedly in the face. Then, even after being subdued, Officer Davis released Rambo, who bit him multiple times. According to the affidavit of Joiner, the assault went on for several minutes. Plaintiff's allegations and testimony create a disputed fact issue regarding the encounter between the police officers and Plaintiff. If the officers' accounts are believed, then Davis and Clayton are entitled to qualified immunity. If Plaintiff's account is believed, then Davis and/or Clayton are not entitled to qualified immunity for punching Plaintiff repeatedly in the face after he had laid face down on the ground for 30 seconds and loudly expressed his intention to surrender.

With respect to Rambo and the dog bites, until Plaintiff was subdued and in handcuffs, Davis was justified in not calling off Rambo. In his complaint, Plaintiff alleged that Officer Clayton pricked himself with a hypodermic needle and started screaming obscenities. At the screening hearing, Plaintiff testified that it was Defendant Ghabbour who searched him for weapons and pricked himself. Either way, Davis would be entitled to qualified immunity for releasing Rambo at that point. In the dark and in the tense circumstances following a chase and arrest of a fleeing, armed felon, Davis did not know why Ghabbour or Clayton was yelling. It was reasonable for Davis to believe that Plaintiff was resisting and that Ghabbour or Clayton needed assistance in ensuring that Plaintiff remained under control. However, Plaintiff further alleged and testified that Davis released Rambo several times after Plaintiff had been subdued, resulting in about 14 dog bites. Plaintiff submitted the affidavit of his fleeing co-felon, Christopher Alan Joiner, who stated that he witnessed "Pascagoula Police officers, assault, handcuff, and then use the K-9 officer dog to attack Randall Williams over and over for several minutes." Doc. [152-11]. Any subsequent release of Rambo after Plaintiff had been handcuffed and completely subdued would not be protected by qualified immunity.

Based on the foregoing, the Court concludes that Plaintiff's excessive force claim against Defendant Davis should be allowed to proceed to trial. Out of an abundance of caution, the Court will not dismiss Officer Clayton from the lawsuit. Plaintiff stated that Clayton punched him repeatedly in the face. The summary judgment evidence suggests that Plaintiff was in fact punched by Davis and not Clayton. It may be the case that Plaintiff is simply mistaken about the identity of the officer who punched him. It is undisputed that at least one of the police officers involved in the chase punched Plaintiff in the face. However, at the moment, the identity of the officer(s) who punched Plaintiff remains an unresolved issue of fact.

### **(3) Failure to Intervene**

Plaintiff alleges that several Defendants had the opportunity to intervene to prevent the act of excessive force against him. Specifically, he asserts that Officers Joshua Ghabbour, Lionel Bourgeois, Michael Dunn, and Steven Loris were standing only a few feet away but failed to prevent the assault.

An officer may be liable under § 1983 for bystander liability when the officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). Liability will not attach where an officer is not present at the scene of the constitutional violation. *Id.* In determining whether a plaintiff has sufficiently alleged a claim for bystander liability, courts should consider whether an officer acquiesced in the alleged constitutional violation. *Id.*

Taking Plaintiff's testimony and allegations as true, he contends that he was punched "repeatedly" in the face and that Rambo kept biting him even after he was apprehended. According to Joiner's affidavit, the assault lasted for "several minutes". Doc. [152-11]. As explained above, the excessive force claim, which serves as the basis of Plaintiff's failure-to-intervene claim, has survived summary judgment. However, the undisputed summary judgment evidence demonstrates that Defendants Dunn and Loris were in the act of apprehending, securing, and searching Plaintiff's co-felon at the time that Officers Davis and Ghabbour were apprehending Plaintiff. Doc. [148-9]. Moreover, there was a four-foot high chain link fence between the locations where Joiner and Plaintiff were apprehended. *Id.* Plaintiff has not offered any testimony or competent summary judgment evidence disputing this characterization of the facts. Accordingly, the undisputed summary judgment evidence demonstrates that Defendants

Dunn and Loris did not have a reasonable opportunity to prevent the harm allegedly committed against Plaintiff by Defendants Davis and/or Clayton.  The summary judgment evidence also demonstrates that Defendant Bourgeois did not arrive on the scene until after Plaintiff was handcuffed and in custody.  Doc. [148-4] at 2; Doc. [148-11].  Other than Davis and Clayton, the only officer specifically identified by Plaintiff who actively participated in the arrest is Defendant Ghabbour.  Accordingly, the motion for summary judgment is granted with respect to Defendants Dunn, Loris, and Bourgeois.  However, at this time, the failure-to-intervene claim remains pending against Defendant Ghabbour.

IT IS THEREFORE ORDERED AND ADJUDGED that the [139] Motion for Summary Judgment filed by Defendants Jackson County, Mississippi and Lamar Palmer are GRANTED. The claims against Defendants Jackson County, Mississippi and Lamar Palmer are dismissed with prejudice.

IT IS FURTHER ORDERED that the [145] Motion for Summary Judgment filed by Defendants Jessica Bolen, Kristi Bourn, Samantha Jones, and Health Assurance, LLC is GRANTED.  The claims against Defendants Jessica Bolen, Kristi Bourn, Samantha Jones, and Health Assurance, LLC are dismissed with prejudice.

IT IS FURTHER ORDERED that the [146] Motion for Summary Judgment filed by Defendant City of Pascagoula, Mississippi is GRANTED.  The claims against Defendant City of Pascagoula are dismissed with prejudice.

IT IS FURTHER ORDERED that the [148] Motion for Summary Judgment filed by Defendants Lionel Bourgeois, Scott Clayton, Richard Paul Davis, Michael Dunn, Joshua Ghabbour, and Steven Loris in their individual capacities is GRANTED in part and DENIED in part.  Plaintiff's claim for excessive force against Defendants Scott Clayton and Richard Paul

Davis remain pending, as does the related failure-to-intervene claim against Defendant

Ghabbour.  The claims against Defendants Bourgeois, Dunn, and Loris are dismissed with

prejudice.

SO ORDERED AND ADJUDGED, this the 13th day of September, 2017.

/s/ *Robert H. Walker*
ROBERT H. WALKER
UNITED STATES MAGISTRATE JUDGE